STATE of Missouri, Respondent,

v.

Paul FREEMAN, a/k/a Paul Washington, Appellant.

No. 13842.

Missouri Court of Appeals,
Southern District,
Division Three.

Nov. 26, 1985.

Motion for Rehearing or to Transfer Denied Dec. 17, 1985.

Application to Transfer Denied Feb. 18, 1986.

Holly G. Simons, Asst. Public Defender, Columbia, for appellant.

William L. Webster, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, for respondent.

FLANIGAN, Judge.

A jury found defendant guilty of assault in the first degree, § 565.050,[1] robbery in the first degree, § 569.020, and armed criminal action, § 571.015, and assessed the punishment at life imprisonment for each offense. The trial court ordered that the sentences run consecutively. Defendant appeals.

In the early morning of December 27, 1983, defendant, armed with a gun, entered a Piggley Wiggley store in Sikeston and

1. Unless otherwise indicated, all references to statutes are to RSMo 1978, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

asked store employee Wesley Francis for change for a $20 bill. While Francis was complying with the request, defendant knocked him to the floor and took over $70 from the cash register. Defendant then shot Francis three times in the head. Although Francis survived, his injuries were severe and rendered him blind in his left eye and deaf in his left ear. The events were witnessed by another store employee, Melvin Moon.

Defendant's first point is that the trial court erred "in not allowing defendant to proceed pro se at the trial level in that defendant asserted his right to so proceed and was denied this constitutionally recognized right with no inquiry into defendant's ability to conduct his own defense."

Defendant's first point was not included in his motion for new trial and accordingly has not been preserved for appellate review. Rule 29.11(d). Defendant has requested review under the "plain error" standards prescribed by Rule 29.12(b). This court affords plain error review and finds no merit in defendant's first point.

■ A defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). "Missouri, prior to *Faretta*, recognized a criminal defendant's right to represent himself. The right is based on Art. 1, § 18(a) of the Missouri Constitution, and Rule 31.02(a). See *Bibbs v. State*, 542 S.W.2d 549, 550 (Mo.App.1976), and the authorities cited there." *State v. Ehlers*, 685 S.W.2d 942, 945 (Mo.App.1985).

In *State v. McCafferty*, 587 S.W.2d 611 (Mo.App.1979), the court of appeals held that in the absence of any request by defendant to represent himself the trial court did not err in failing to inform him of his right to do so and that the right to self-representation is one which the defendant "must clearly and unequivocally assert before trial." The following authorities support the corollary principle that there can be no denial of the right to self-representation in the absence of an unequivocal re-

quest to exercise that right. *United States v. Bennett*, 539 F.2d 45, 50[3] (10th Cir. 1976); *People v. Potter*, 77 Cal.App.3d 45, 143 Cal.Rptr. 379, 382[2] (1978); *Russell v. State*, 270 Ind. 55, 383 N.E.2d 309, 313[6] (1978); *Anderson v. State*, 267 Ind. 289, 370 N.E.2d 318, 320[2] (1977); *Block v. State*, 95 Nev. 933, 604 P.2d 338, 340[2] (1979); *Stowe v. State*, 590 P.2d 679, 682[1] (Okla.Crim.1979); *Felts v. Oklahoma*, 588 P.2d 572, 576[3] (Okla.Crim.1978). See 98 A.L.R.3d 13, 61, § 13.

Several hearings were held prior to the trial itself which was held on May 17, 1984. At all of these hearings the prosecutor appeared and the defendant appeared in person and by his attorney, Daniel A. Beatty, an assistant public defender.

On February 9, 1984, a hearing was held which was prompted by a letter which defendant sent to the court. Defendant informed the court that he did not feel that he was being represented properly and indicated he had had difficulty getting in contact with Mr. Beatty. Mr. Beatty informed the court that he was on active duty with the Navy in Seattle, Washington, when the defendant attempted to contact him. Mr. Beatty also said, "There was a letter from [defendant] regarding possible self-representation, *which I understand he did not want to do at this time*. However, it is also my understanding that he is trying to hire his own lawyer but has not been able to do so. His family may still be working on it." At the conclusion of that hearing defendant told the court that he wanted "to keep his attorney."

On March 10, 1984, a hearing was held. At that time the court ordered the case, at defendant's request, sent back to Scott County, from which defendant earlier had taken a change of venue. There was no mention of any dissatisfaction with attorney Beatty.

On April 26, 1984, a hearing was held. Attorney Beatty stated to the court, "[Defendant] has instructed me to file a motion to withdraw. *He desires to retain his own counsel or to represent himself.* I don't

think he is satisfied with the way the case is going at this point."

The court asked the defendant what the problem was and defendant stated, "Mr. Beatty and I have not had communications I feel I am entitled to.... I have requested certain things of Mr. Beatty I would appreciate for him to do for me. Mr. Beatty told me he had done them, and when everything comes to a certain point, they have not been done."

The court asked the defendant, "What is your plan?" The defendant answered that he had been writing "to the U.S. District Court and Bar Association and *trying to see if they will send me a lawyer.*" Defendant also said that he had been writing the NAACP. The court asked the defendant if he was going to hire an attorney and the defendant responded, "I didn't tell Mr. Beatty I was going to hire an attorney. I was telling Mr. Beatty *I was going to see what would happen.*"

There was some discussion of obtaining another public defender for defendant but a representative of the public defender's office said, "There is just no provision for doing that."

The court asked the defendant what it was which he had asked attorney Beatty to do and which Beatty had not done. The defendant mentioned that he had requested Beatty to obtain a transcript of the preliminary hearing. Mr. Beatty stated he did not recall that request and that the hearing was not transcribed.

The following then occurred:

"THE COURT: Mr. Freeman, *I am not going to let you represent yourself,* because they would switch over to capital murder (sic) and put you in the gas chamber. You don't have that capability and that training to defend yourself....

My job is to see that you have adequate representation. If there is a personality conflict, that's one thing; but I am not going to let you represent yourself for your protection. They would take you out like a sitting duck and you wouldn't have a chance.

Now, the problem for me is to get you represented, but, at the same time, try to get you somebody that you can work with. The NAACP is not going to spend 10 cents on you. The Bar Association is not going to spend any money on you. If they did, it would take 50 million a year to represent people.

If I can't work it out with my defenders, why don't you see if the defender system will transfer Gary down here to take this case and maybe trade off something?

[REPRESENTATIVE OF THE PUBLIC DEFENDER'S OFFICE]: I can call my state office, but the policy has been in the past, and this has come up before in the other counties, where they have not made me come when other judges have requested me.

THE COURT: Let's see what we can work out, if there is an alternative available. If there is not, then Mr. Freeman, you may have to stay married to him, because, actually, the job to decide whether he's competent or not is left to me, and I have great faith in him. He is kind of quiet, but he knows his job. I will look into it, and if it is possible, change attorneys for you.

You have to understand if it's not possible and I cannot, you will have to stay hooked. *I will not let you go in alone.* This world is a war world. They are adversaries. You are not an adversary, and I will not let you walk in that meat grinder alone. You don't necessarily have to like the guy that defends you. That's something you need to know."

The defendant then informed the court that he had contacted a St. Louis lawyer and "he said due to my financial background that he couldn't." The following then occurred:

"THE COURT: I cannot assure you that I will take Mr. Beatty off the case, *because I won't let you represent yourself.* I don't think you can. That's the only reason. I am not going to have you knocked plumb in the puddle without somebody standing there. Even if they

don't like you, they will do their best to defend you.

. . . . .

THE COURT: Are you happy with the venue right now?

THE DEFENDANT: Yes.

THE COURT: *The only real complaint you have right now is you would like to change attorneys,* if possible?

THE DEFENDANT: *Yes.*

MR. BEATTY: Your Honor, can I say just a couple of things? I don't have a conflict representing Mr. Freeman. I have been trying to do what he tells me to do. I think his personality conflict— it's on his part, not mine. I will be glad to represent him all the way through.

THE COURT: I understand. We will see if I can roll him another defender. If I cannot, what Mr. Beatty is saying, he is ready to go. Let's set this for trial."

The case was set for May 17, 1984. The court asked the defendant if that setting was all right and the defendant answered, "That's all right with me."

On May 10, 1984, the defendant informed the court that he had again been in touch with the St. Louis attorney and that the latter had said "he would charge me a total of $5,000 to represent the case." Defendant added, "I was going to see if I could get on the family." After being informed that the case was set for trial on May 17, the defendant said, "I wanted a little more time. It really doesn't make any more difference if the prosecutor is ready."

On May 17, prior to the commencement of the trial, in response to questioning by the court, defendant stated that he was "satisfied with Mr. Beatty now."

■ The record shows that although defendant was unsatisfied with his attorney during some of the preliminary proceedings, and attempted without success to engage other counsel, at no time did defendant make an unequivocal request to the trial court that he be permitted to represent himself. The record further demonstrates that defendant's dissatisfaction with his attorney no longer existed when the trial commenced. It is true that some of the remarks made by the trial court show an unwillingness to accede to a request for self-representation if such a request had been made. The trial court, however, cannot be convicted of error in denying the defendant his right to self-representation in the absence of an unequivocal request to exercise that right. There was no such request and defendant's first point lacks factual support. The record fails to show that the pretrial proceedings dealing with the matter of defendant's representation resulted in "manifest injustice or miscarriage of justice." Rule 29.12(b). Defendant's first point has no merit.

Defendant's second point is that the trial court erred in denying defendant's motion for a continuance, made at the close of the state's evidence, on account of the absence of defense witness Sadie Washington. The witness, defendant's sister, had been subpoenaed but failed to appear. Rule 24.09 requires that an application for continuance be made by a written motion accompanied by the affidavit of the applicant or some other credible person setting forth the facts upon which the application is based, unless the adverse party consents that the application for continuance be made orally. Rule 24.10 sets forth the requirements of an application for continuance on account of the absence of witnesses.

■ Defendant filed a written motion for continuance which failed to meet the requirements of Rule 24.10. The written motion was not accompanied by an affidavit. The motion failed to set forth facts showing the materiality of the evidence sought to be obtained and due diligence on the part of defendant to obtain such witness. It failed to set forth the address of the witness and also failed to set forth facts showing reasonable grounds for belief that the attendance of the witness would be procured within a reasonable time. The motion failed to set forth "what particular facts the witness will prove," Rule 24.10(c), and it also failed to state "that such witness is not absent by the connivance, consent or procurement of the applicant."

Rule 24.10(d). Although counsel for defendant made some remarks in support of the written motion, those remarks did not cure the foregoing deficiencies. The officer who served the subpoena upon the witness informed the court that the witness stated to him, "I will not be there. I am not going to get on the stand and lie for Paul." Defendant made no objection to the giving of that information.

▪ An application for continuance in a criminal case is addressed to the sound discretion of the trial court and the appellate court will not interfere unless it clearly appears that such discretion has been abused. *State v. Oliver*, 572 S.W.2d 440, 445[2] (Mo. banc 1978). In exercising the discretion the trial court is entitled to consider whether the application meets the requirements of The Rules of Criminal Procedure. *State v. McGinnis*, 622 S.W.2d 416, 420 (Mo.App.1981). The trial court did not abuse its discretion in denying the motion. Defendant's second point has no merit.

Defendant's third point is that the trial court abused its discretion by sentencing defendant to three consecutive life terms "because such punishment is shocking to the conscience in that each count arose from a single incident and the elements of the three counts overlap to such an extent that consecutive sentences constitute cruel and unusual punishment under the Missouri and United States Constitutions."

▪ The jury found defendant guilty of assault in the first degree, committed by means of a deadly weapon, § 565.050.2, which at the time of the instant event was a class A felony. He was also convicted of robbery in the first degree, a class A felony, § 569.020. Life imprisonment is an authorized term of imprisonment for a class A felony, § 558.011.1(1). Defendant was also convicted of armed criminal action, § 571.015, which, under that statute, is punishable "by imprisonment by the division of corrections for a term of not less than three years." Life imprisonment is an authorized punishment for armed criminal action. *State v. Kirksey*, 647 S.W.2d 799,

801 (Mo. banc 1983). The punishment for armed criminal action "shall be in addition to any punishment provided by law for the crime committed by, with or through the use, assistance or aid of a dangerous instrument or deadly weapon." § 571.015.1. The language just quoted does not require that a sentence imposed for armed criminal action be consecutive to a sentence for the felony conviction upon which the armed criminal action charge is based. *State v. Treadway*, 558 S.W.2d 646, 653[16] (Mo. banc 1977), overruled on other grounds, *Sours v. State*, 593 S.W.2d 208 (Mo. banc 1980). There the Supreme Court said: "[T]he trial court should be able to sentence a defendant consecutively or concurrently as it sees fit."

Shortly after 4:00 a.m. on December 27, 1983, defendant entered the Piggley Wiggley store at which Wesley Francis was employed. Francis gave the following description of what next occurred:

"I was standing at my register and I heard the door open. I looked up, and Paul Freeman walked in the door. He was waving a bill and he said it was a 20, but I couldn't see it.

He walked through the last checkout and I said, 'You will have to come over here so I can change it for you.' When he walked beside me, I looked at him and I said, 'I will have to get my manager up here to see if I can change it first.'

He said, 'No, my cab is going to leave me.' It was snowing outside and I didn't want him walking, so I opened my register and his hands were maybe four inches from my face and he was already swinging at me. He hit me in my left eye and knocked me down, and I looked up and I saw him digging money out of the register as fast as he could and putting it in his right pocket. He came around behind me and said, 'Sorry I have to do this, but I can't leave no witnesses,' and he shot me in the—

Q. Show the jury where the shots hit you.

A. One here, one here, one here.

Q. That's on the top of your left eye and also on your left ear; is that right?

A. Yes, sir."

Francis described the weapon used by defendant as "a small caliber handgun." Francis' description of the occurrence was generally confirmed by Melvin Moon, 22, who had attended school with defendant. After describing the shooting, Moon testified, "I saw Paul Freeman running out the door. He had his back to me. He stopped at the door because he saw my reflection. Before he got ready to step on the mat he turned around and said, 'Moon, don't tell what you just seen.'" Moon testified defendant's weapon was a "22 handgun." Moon also testified, "I knew Freeman for 15 or 16 years. Couldn't have been nobody else that looked that much like him. I have known him a long time."

Mark Sever, M.D., testified that he examined Francis at 4:50 a.m. at "our emergency facility," and Francis had three gunshot wounds to the head. Dr. Sever testified he did not expect Francis to live.

■■■■ The trial court had the power to order that the three life sentences run consecutively. § 558.026.1. *State v. Greathouse*, 694 S.W.2d 903, 911[20] (Mo.App. 1985). Where the defendant is convicted of separate offenses and the sentences imposed are within statutory limits, the consecutive effect of the sentences does not constitute cruel and unusual punishment. *State v. Repp*, 603 S.W.2d 569, 571[5] (Mo. banc 1980); *State v. Jackson*, 676 S.W.2d 304, 305[3] (Mo.App.1984). Punishment within the statutory limit is not cruel and unusual unless it is so disproportionate to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper. *State v. Rider*, 664 S.W.2d 617, 621[10] (Mo.App.1984). Although the three offenses arose out of the same incident, they were separate offenses. Defendant does not claim otherwise and

defendant makes no claim of a double jeopardy violation.[2]

In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Supreme Court held that the final clause of the Eighth Amendment ["nor cruel and unusual punishments inflicted"] prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed.

At p. 3009 of 103 S.Ct. the Court said:

"In sum, we hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals. But no penalty is per se constitutional."

Also at p. 3009, n. 16, the Court said:

"Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits. In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate."

Finally, at pp. 3010–3011, the Court said:

"In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sen-

**2.** In *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Supreme Court held that the Double Jeopardy Clause does not prohibit conviction and sentence of a criminal defendant in a single trial on both a charge of armed criminal action and a charge of first degree robbery, the underlying felony.

tences imposed for commission of the same crime in other jurisdictions."

The punishment of life imprisonment which the jury assessed for each of the three offenses was within the statutory limit. This court must accord "substantial deference," *Solem*, supra, at 3009, to the legislature and to the sentencing court. Each of the three offenses which the defendant committed is a very serious one. Life imprisonment sentences have been imposed on other criminals in Missouri for these offenses.[3] This court does not have access to a computer system which might disclose actual sentences imposed for the same crimes in other jurisdictions. This court has examined the statutes of the nearby states of Arkansas, Illinois, Kansas, Kentucky, Oklahoma, Tennessee and Texas.

With respect to the offense of robbery in the first degree, life imprisonment is an authorized punishment in Arkansas [Ark. Stat.Ann. §§ 41–901(1)(b), 41–2102], Kansas [Kan.Stat.Ann. §§ 21–3427, 21–4501], Oklahoma [Okla.Stat.Ann. tit. 21, § 801], Tennessee [Tenn.Code Ann. § 39–2–501], and Texas [Tex.Penal Code Ann. §§ 12.32, 29.-03]. In Illinois the maximum punishment for that offense is 30 years imprisonment [Ill.Rev.Stat. ch. 38, §§ 18–2, 1005–8–1(a)(3) ], and in Kentucky the maximum punishment is 20 years [Ky.Rev.Stat.Ann. §§ 515.020, 532.060(2)(b) ].

Although each of those seven states has a statute dealing with the type of assault involved here, none authorizes life imprisonment for that offense. The respective maximum punishments for that offense in those states are: Arkansas—20 years [Ark. Stat.Ann. §§ 41–901(1)(c), 41–1601], Illinois—5 years [Ill.Rev.Stat. ch. 38, §§ 12–4, 1005–8–1(a)(6) ], Kansas—20 years [Kan. Stat.Ann. §§ 21–3414, 21–4501(c) ], Kentucky—20 years [Ky.Rev.Stat.Ann. §§ 508.-

010, 532.060(2)(b) ], Oklahoma—10 years [Okla.Stat.Ann. tit. 21, § 645], Tennessee—10 years [Tenn.Code Ann. § 39–2–101], Texas—10 years [Tex.Penal Code Ann §§ 12.34(a), 22.02].

The offense of armed criminal action is not defined by statute in Arkansas, Kansas, Kentucky and Texas. In Illinois the maximum punishment for that offense is 15 years [Ill.Rev.Stat. ch. 38, § 33A–1 et seq.]. In Oklahoma, for the first such offense, the maximum is 10 years [Okla.Stat. Ann. tit. 21, § 1287] and in Tennessee the maximum is 5 years [Tenn.Code Ann. § 39–6–1710].

This court has no jurisdiction to declare unconstitutional any of the Missouri statutes authorizing the punishment of life imprisonment for each of the three instant offenses. Defendant has not attacked the constitutionality of any of those statutes. This court does not believe that the "proportionality analysis" enunciated in *Solem* requires this court to find that a life sentence for armed criminal action is disproportionate merely because some other states, which define the offense, do not authorize that punishment or merely because the offense is not defined as such in other states.

This court holds that the sentence imposed for each of the three offenses was proportionate and was within constitutional limits. This court further holds that the ordering of the sentences to run consecutively did not constitute an infliction of cruel and unusual punishment. Defendant's third point has no merit.

Defendant's fourth point is that the evidence was insufficient to support the verdict, in that the testimony of state's witnesses Moon and Francis, identifying defendant as the robber, "was tainted by unreliable procedures attending their out-

3. In *State v. Kirksey*, 647 S.W.2d 799 (Mo. banc 1983), a life sentence for armed criminal action was affirmed. In the following cases, life sentences for assault were affirmed: *State v. Hayes*, 624 S.W.2d 16 (Mo.1981); *State v. Barmann*, 689 S.W.2d 758 (Mo.App.1985); *Davis v. State*, 657 S.W.2d 677 (Mo.App.1983); *State v. May-*

hue, 653 S.W.2d 227 (Mo.App.1983). In the following cases, life sentences for first degree robbery were affirmed: *State v. Hayes*, supra, *State v. Rider*, 664 S.W.2d 617 (Mo.App.1984); *State v. Johnson*, 603 S.W.2d 683 (Mo.App.1980); *State v. Battle*, 588 S.W.2d 65 (Mo.App.1979); *State v. Rapheld*, 587 S.W.2d 881 (Mo.App.1979).

of-court identification of defendant." At the time of the offense both Freeman and Moon had an adequate opportunity to observe and identify defendant. Indeed Moon, whom defendant called by name, had known defendant for many years. Defendant's fourth point has no merit.

The judgment is affirmed.

PREWITT, C.J., CROW, P.J., and MAUS, J., concur.